Christopher HYNES, Plaintiff,

v.

Correctional Sergeant Bobbie Jo LaBOY, Correctional Officers Cobb, Shope, John Zemken, Michael Rhynders, Edward Doyle, and Michael Capra, Defendants.

No. 91 Civ. 8625 (RWS).

United States District Court, S.D. New York.

May 30, 1995.

Prisoners' Legal Services of New York, New York City (Matthew L. Guadagno, William D. Gibney, Steve Latimer, of counsel), for plaintiff.

Dennis C. Vacco, Atty. Gen. of State of N.Y., New York City (Frederic L. Lieberman, Marilyn T. Trautfield, Asst. Attys. Gen. of counsel), for defendants.

## OPINION

SWEET, District Judge.

Both the plaintiff Christopher Hynes ("Hynes"), an inmate in the state correctional facilities, and the defendants Michael Cobb ("Cobb") and James Shope ("Shope"), state corrections officers, have moved under Rules 50(b) and 59(a) for judgment as a matter of law, or in the alternative, for a new trial. For the reasons set forth below, both motions are denied.

### Prior Proceedings

This action was commenced by Hynes on December 24, 1991 under 42 U.S.C. § 1983 against seven corrections officers. Hynes sought damages for two incidents of excessive use of force against him while incarcerated in the Southport Correctional Facility ("Southport") and Green Haven Correctional Facility ("Green Haven"), facilities of New York State. He also sought damages under 42 U.S.C. § 1983 seeking damages for in-

fringement of his First Amendment rights. Defendant Correction Officer John Zemken ("Zemken") sought by counterclaim damages against Hynes for battery.

From October 3 to October 17, 1994 the issues raised by the pleadings were tried to a court and jury. Hynes testified on his own behalf and presented testimony from three inmates, a physician, one of the defendants, and an inspector general for the Department of Correctional Services ("DOCS") of New York. Defendants Sergeant Bobbie Jo Gladding (sued as LaBoy) ("Gladding"), Cobb, Shope, Zemken, Correction Officer Michael Rhynders ("Rhynders"), Sergeant Edward Doyle ("Doyle") and Correction Officer Michael Capra ("Capra") testified on their own behalf and presented the testimony of a nurse and physician assistant and deposition testimony.

At the conclusion of the trial, the jury was presented with a Special Verdict Form consisting of twenty-five questions, annexed hereto as Appendix A. The jury returned a verdict of $1,250 in favor of Hynes against defendants Cobb and Shope in connection with the events at Southport. No punitive damages were assessed.

The jury found that Hynes failed to establish the liability of Capra, Doyle, Gladding, Rhynders, and Zemken in connection with the events at Green Haven. Zemken was awarded $1,500 on his battery counterclaim against Hynes.

At the close of the trial, time to make motions directed to the verdict was extended and the instant motion was heard and considered fully submitted on February 15, 1995.

### The Facts

#### The Events at Southport

During May of 1991 Hynes was incarcerated at Southport to which inmates with unsatisfactory disciplinary records had been assigned. On May 28 and 29, 1991 a group of inmates took over the yard. The morning after the incident, May 30, 1991, Hynes was taken from his cell for transfer because he had been in the yard during the takeover.

He was hand-cuffed behind the back, taken to a room and was told to sit. Other inmates were in the room, including Michael Leggette and Carlos Garcia.

Hynes began talking with Garcia. An unknown officer came up to Hynes, directed him to discontinue any conversation and an exchange of obscenities ensued. Cobb and Shope were part of the Corrections Emergency Response Team ("CERT") and had been assigned to Southport to regain control of the facility. They grabbed Hynes' arm pits and walked him at a quick pace out of the room towards the draft room. As they approached the draft room, Hynes' head hit the door frame and he was also hit in the eye. He dropped to the ground and temporarily lost consciousness. Another officer came along, a further exchange occurred, and Hynes was taken into the draft room.

Hynes was then taken to the Southport infirmary. He received two stitches for an abrasion above his right eye. He also received a "running stitch"[1] for a five centimeter jagged laceration on the top of his head. There was bruising and swelling under his right eye.

Shortly after being treated, Hynes was transferred to Green Haven. The ride took five to six hours.

### The Events at Green Haven

Upon arrival at Green Haven, Hynes was examined by Nurse Coloni. She arranged to have him admitted to the infirmary that day where he stayed until June 7, 1991. Photos were taken of Hynes on May 31, 1991 which showed Hynes had a laceration on the top of his head and a swollen black eye.

Hynes was assigned a cell located in the front of the gallery, near the guards, at the Special Housing Unit ("SHU") at Green Haven. He had a number of exchanges with the guards and complained about many conditions within the SHU. Gladding and Rhynders were familiar with Hynes and aware that Hynes had been at Southport during the takeover.

---

1. Dr. Zeller testified that a running stitch is like hemming something; it was not cut for each stitch. (Tr. 191). It entered the skin six times. (Tr. 191).

Testimony was presented by inmate Danny Hearns that he heard Rhynders tell Doyle that he was going to shut Hynes' mouth up. Before time for Hynes' shower on July 3, 1991, most of the inmates on his gallery were let out into the yard and Capra and Zemken escorted him to the shower.

Hynes wore shackles around his ankles, a waist chain, and handcuffs. At the shower, the restraints were removed, an altercation ensued, Zemken was kicked in the testicles and Hynes was forced to the floor. Doyle, Rhynders, Capra, and Gladding subdued Hynes.

Gladding directed the officers to replace the handcuffs and the shackles, and Nurse Fowler examined Hynes. The ambulatory health record for the examination that occurred on July 3, 1991 indicated that Hynes had pain in his left eye, back and left foot, a sclera inject in his left eye, his upper eye lid was down, his vision was reported as being blurry and he had abrasions to the lower back part of Hynes' head and his back.

Hynes was examined again on July 3, 1991 by Physician Assistant McCue. The records of that visit indicted that Hynes' left eye had now developed ecchymosis (a black eye) and edema (swelling), as well as erythema (redness) in his left ear. Under the "subjective" or patient's complaint portion of the report were references to Hynes' elbow, shoulder, foot, and lower back, without any explanation.

On July 5, 1991 Hynes was examined again. The ambulatory health records indicated that his left eye was bruised, with a "subjunctival hemorrhage." Two of Hynes' toes on his right foot were ecchymotic or bruised and x-rays and a photo were taken on July 10, 1991.

According to Hynes' testimony, he could not move his arm for a week to two weeks after the incident and it was six months before he could fully extend his arm again.

### Weight of the Evidence Supported the Jury's Verdict Against Shope and Cobb

■ The standard for judgment as a matter of law, after judgment is entered (previously, a judgment n.o.v.) is similar to the standard applicable for a judgment at the close of the opposition's case (previously, a directed verdict). *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962); *Diebold v. Moore McCormack Bulk Transport Lines, Inc.*, 805 F.2d 55, 57 (2d Cir.1986). Explaining the standard, the Court of Appeals has stated that the guiding principle is whether,

viewed in the light most favorable to the non-moving party, the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.

*Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038–39 (2d Cir.1992).

■ Rule 59, Fed.R.Civ.P., permits the granting of a new trial after an earlier trial by jury. A motion for a new trial may be joined with a motion for judgment as a matter of law. Rule 50(b), Fed.R.Civ.P. The Court is empowered to grant both motions, for a judgment as a matter of law and a new trial, simultaneously in the same action. *See Gehrhardt v. General Motors Corporation*, 434 F.Supp. 981, 986 (S.D.N.Y.1977), *aff'd*, 581 F.2d 7 (2d Cir.1978).

■ A trial judge reviewing a jury verdict and judgment pursuant to a motion for a new trial has greater judicial discretion to grant such a motion than a motion for judgment as a matter of law. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251–52, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940); *Bevevino v. M.S. Saydjari*, 574 F.2d 676, 683–84 (2d Cir.1978). Where the court is convinced "that the jury has reached a 'seriously erroneous result' or that the verdict is ... against the weight of the evidence ...", the court may order a new trial. *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir.1983); *Purnell v. Lord*, 952 F.2d 679, 686 (2d Cir.1992). The Court may weigh the evidence and need not view it in the light most favorable to the non-moving party. *Bevevino*, 574 F.2d at 684.

■ Here the jury found in its answers to Questions 1–4 of the Special Verdict, annexed hereto as Appendix A, that Cobb and Shope

maliciously and sadistically harmed Hynes during the incident at Southport, and awarded damages in the amount of $1,250. (Answer to Question 7, Appendix A).

This jury verdict is supported by the weight of evidence and is not seriously erroneous. Evidence was presented that as a result of the Southport incident Hynes suffered a 5 centimeter jagged laceration on the top of his head, an abrasion above his right eye, which required two stitches, and bruising and swelling under his right eye. These injuries were established through expert testimony, medical exhibits, and photographic evidence.

Evidence was also presented that Hynes is 5'5" and 145 pounds and much smaller than Cobb at 6' and 220 pounds and Shope at 6'2", approximately 235–40 pounds. The incident occurred the day after a prison takeover at Southport. Both Cobb and Shope as CERT members have lengthy experience as correctional officers and have undergone training in the proper use of force and defensive tactics.

In light of all the evidence presented at trial, the most likely explanation for Hynes' injuries was his version of the events. It was the day after a takeover at Southport and the atmosphere was tense. According to Hynes, he got into a verbal exchange with Cobb and Shope. As a result, they took him out of the draft room and rammed his head first into a doorway, hit him in the eye with an object, and then he was kicked in the stomach and testicles while on the floor.

Dr. Zeller testified that she was an expert in emergency medicine, a member of the College of Emergency Medicine, and for three years worked full time at Our Lady of Mercy Medical Center in the emergency room. She is in charge of the emergency room when she works there. She concluded that it was "highly unlikely" that the 5 centimeter laceration to the top of Hynes' head was self-inflicted.

Cobb and Shope gave a version of the events which conflicted with Hynes'. In reaching its conclusions, the jury choose to credit Hynes, and there was evidence to support that finding from Hynes, Zeller and the objective evidence.

## The Weight of the Evidence Supported the Jury's Verdict in Favor of Gladding, Rhynders, Zemken and Doyle

The jury answered to Questions 9–12 in the negative as to each of the defendant officers involved in the Green Haven incident. In so doing, it credited the testimony of the officers, Nurse Coloni, and Investigator Seyfert which was in direct conflict with that of Hynes and inmate Hearns. The testimony submitted by the defendants, if credible as the jury must have concluded it was, far outweighed that of Hynes and was not seriously erroneous.

There was conflicting evidence as to the motivation behind the alleged assault. Hynes undertook to establish that the alleged assault was premeditated and Hearns testified that he heard Rhynders tell Doyle that Rhynders was going to, "[s]hut Hynes' mouth up" the next time he came out for his shower, and that he, Hearns, passed this warning on to Hynes. However, defendants presented unrefuted evidence that Doyle was not on duty from June 27 through July 2, and, therefore, Rhynders could not have made any such remark to him. The jury no doubt found Hearns' testimony of the alleged threat to be unworthy of belief.

After the defendants' evidence rebutting premeditation, Hynes was recalled to testify later in the trial on October 12, and for the first time recalled an argument with Rhynders on July 2, although he had not so testified in his case on October 3 and 4.

Hynes' testimony that four officers, including Capra and Zemken, escorted him to the shower was disputed and made much of the fact that neither Capra nor Zemken wore their glasses during the escort and Capra, alleged to be part of the escort, did not work on SHU as a regular job but served as an escort officer to accompany inmates on and off the unit.

Hynes testified that after his cuffs were removed, Zemken made an unprovoked attack on him. Investigator Seyfert concluded that Hynes kicked Zemken in the groin before any force was used on Hynes. Hynes' medical expert conceded on cross-examination that had Hynes been picked up bodily

and thrown back onto a tile floor, with his head hitting the floor, as Hynes testified had happened, she would expect to find evidence of severe head trauma as a concussion.

Hynes' testimony was directly contradicted by the defendants' with respect to the alleged assault itself.

The SHU Log Book which contains the dates Hynes went to the yard and the medical records contradict Hynes' testimony with respect to the effects of the alleged assault and the objective medical records also did not support his testimony.

The weight of the evidence established that Hynes was being subdued during the struggle he initiated and that Hynes' eye came into contact with the lip of the shower.

The jury's determination weighed the credibility of plaintiff's own testimony and that of Danny Hearns, and his medical expert, Dr. Zeller, who had not examined or spoken to Hynes before her testimony. The preponderance of the credible evidence demonstrated that there was no threat made to Hynes, that Hynes was the aggressor in this incident, and that defendants Gladding, Doyle, Capra and Rhynders used only that amount of force that was reasonable and necessary under the circumstances to restrain Hynes following the incident which he provoked.

### The Weight of the Evidence Supported the Jury's Verdict in Favor of Rhynders

Rhynders' claim for damages, arising out of the assault upon him by Hynes, was supported by his testimony, the investigation and report of Investigator Seyfert and the medical evidence. It was contradicted by Hynes, and the jury in its answers to Question 23–25 determined the credibility issue in favor of Rhynders. That determination was not seriously erroneous.

### The Weight of the Evidence Supported the Jury Verdict With Respect to the Claim of Supervisory Liability Against Gladding and Bystander Liability Against Capra

The jury found by answering question 15 and 19 in the negative that Capra was not liable as a bystander, nor was Gladding liable as a supervisor, both being present at the incident at Green Haven.

The jury determined in the first instance that no force at an unconstitutional level was used on Hynes. Even if Hynes had been able to prevail on his underlying claim, there was insufficient evidence to find Sergeants Gladding or Capra liable for failing to intervene on Hynes' behalf.

The first knowledge of Sergeant Gladding of anything unusual came from Zemken's scream. She saw Zemken fall in toward the shower and saw Hynes on his back. She ordered that Hynes be flipped to his stomach and supervised while the officers applied the defensive holds and then the restraints, and she applied the leg restraints. She directed that Hynes receive the appropriate medical attention, and be returned to his cell. There was no evidence that Gladding directed the officers to take any inappropriate action. There is no evidence of any action taken by Capra, who was simply present, nor any evidence of an opportunity to intervene within the time span of the incident, given its character as he observed it.

"This was not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator." *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988). *Meriwether v. Coughlin*, 879 F.2d 1037, 1047 (2d Cir.1989), cited by Hynes, is inapposite, involving, as it did, the abuse at three different facilities over a period of more than two weeks. *Id.* at 1040. Similarly, *Anderson v. Branen*, 17 F.3d 552 (2d Cir.1994), also cited by Hynes, presented a different factual pattern in view of the nature of the assault at issue and the opportunity of the supervisor to intervene multiple times. *Id.* at 557–558.

Here, the incident in the shower lasted between two and five minutes. By the time the altercation started, neither Gladding nor Capra could determine its cause or conclude that any impropriety was occurring for which either had any responsibility. In fact, the jury concluded that no impropriety or constitutional tort did occur.

### The Damages Assessed Were Neither Excessive Nor Inadequate Nor the Result of Compromise

By its answer to Question 7, the jury awarded $1,250 to Hynes for injuries

incurred during the Southport incident and by its answer to Question 25 awarded $1,500 damages to Zemken arising out of the Green Haven incident. The determinations are particularly within the jury's competence and were neither excessive nor inadequate.

■ The same standards governing a claim that a jury's award is excessive should also apply when reviewing a claim that a jury awarded inadequate damages. *Caskey v. Village of Wayland,* 375 F.2d 1004, 1008 (2d Cir.1967). When faced with a claim that a jury awarded excessive damages, a reviewing court is "constrained to give due deference to the fact-finding role of the jury ..." *Raucci v. Town of Rotterdam,* 902 F.2d 1050, 1058 (2d Cir.1990). Thus, the jury's award must be upheld unless "the damages awarded are so excessive 'as to shock the judicial conscience.'" *Raucci,* 902 F.2d at 1058; *Scala v. Moore McCormack Lines, Inc.,* 985 F.2d 680, 683 (2d Cir.1993).

Consistent with the tenet that:

[i]n determining whether a particular award is excessive, courts have reviewed awards in other cases involving similar injuries, "bearing in mind that any given judgment depends on a unique set of facts and circumstances."

*Scala,* 985 F.2d at 684 (*quoting Nairn v. National R.R. Passenger Corp.,* 837 F.2d 565, 568 (2d Cir.1988)); *See Ismail v. Cohen,* 899 F.2d 183, 186 (2d Cir.1990), Hynes has cited authorities to demonstrate that his award is inadequate.

However, only one of the cases cited arose in the context of a claim that an award was inadequate and that claim was rejected. *Green v. Johnson,* 977 F.2d 1383 (10th Cir. 1992). Each of the other cases concerned either a claim that the award was excessive, *Bogan v. Stroud,* 958 F.2d 180 (7th Cir.1992) (Court of Appeals upheld damage award to inmate who in fight with officers, resulting in multiple superficial stab wounds to inmate, loss of consciousness, received no compensatory damages and $7,000 in punitive damages); *O'Neill,* 839 F.2d 9 (Court upheld compensatory damages of 85,000 and punitive damages of $135,000 for jail detainee, who was assaulted by two police officers while in handcuffs. Plaintiff received a frac-

tured nose, lacerations to the face and head and no permanent injuries. Lost wages were a factor in the award.); *Wheatley v. Ford,* 679 F.2d 1037 (2d Cir.1982); or a use of force beyond that which allegedly occurred at Southport and/or resulting in more substantial injuries than Hynes suffered, *Flowers v. Phelps,* 956 F.2d 488 (5th Cir.1992); *Giroux v. Sherman,* 807 F.Supp. 1182 (E.D.Pa.1992); *Jones v. Huff,* 789 F.Supp. 526 (N.D.N.Y.1992) (repeated use of force to inmate who was first stripped by officers, resulting in fracture of bone around eye was awarded $10,000); *Blissett v. Coughlin,* (W.D.N.Y. October 8, 1992) (Civ. 84–1049A) (Court, according to a newspaper account of the case, upheld jury award of $120,000 to an inmate who claimed he had been beaten by officers, insulted with racial slurs and left in a cell soiled with human excrement for nine days).

*Sackett v. Dylag,* (W.D.N.Y. May 10, 1993) (Civ. 86–0644) involved an inmate who had been beaten in retaliation for assisting Prisoners Legal Services in an investigation of another inmate's death. The jury awarded $65,000 damages against the seven officers for what defendants described as a cut lip, tooth trauma, facial contusion and emotional trauma.

The jury could reasonably have concluded that $250 per day would adequately compensate Hynes for his pain and suffering for the five days from when Hynes was injured, May 30, 1991, until he was medically cleared for discharge from the infirmary, June 3, 1991, given the nature of his injuries, two cuts and a black eye. While the awards cited by Hynes are higher than his, they represent a broad range of awards. His $1,250 award does not shock the judicial conscience and thus shall stand.

As to the injury to Zemken resulting from Hynes' kick to the testicles, Zemken testified to excruciating pain, lost days of work, embarrassment, and the restraint on his relationship with his wife, all of which provide support for the jury's determination as to the appropriate damages to award him.

■ The award to Hynes for the Southport incident was not inadequate for the rea-

sons set forth nor does it establish an improper compromise in relation to the award to Rhynders. Further,

> [a]n inadequate damages award, standing alone, does not indicate a compromise among jurors ... Besides inadequate damages, there must be other indicia of compromise, such as difficulty in jury deliberations or close questions of liability.

*Diamond D. Enterprises USA, Inc. v. Steinsvaag,* 979 F.2d 14, 17 (2d Cir.1992) (citations omitted), *cert. denied,* —— U.S. ——, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993). There is no such indicia here.

Hynes has referred to the course of jury deliberations as evidencing compromise of the question posed by the jury during its deliberations. Court Exhibit 25, "[w]e need *punitive damages* defined as it relates to this case."

The jury deliberations began on October 13, 1994 at approximately 1:35 PM. The jury deliberated all day on October 14, 1994 and did not meet again until October 17, 1994 when they delivered their verdict at approximately 12:05 PM, following the receipt of the following exhibits:

| Court Exhibit Number | Date | Time | Comment |
|---|---|---|---|
| 2A | 10/13/94 | 1:40 PM | Final special verdict form |
| 4 | 10/13/94 | 3:00 PM | Jury: 1. Medical records from South Port. 2. Nurse Colonie (sic) testimony when he arrived at Green Haven. Shope & Cobb testimony. |
| 5 | 10/13/94 | 3:35 PM | Court: Answer to Exhibit 4. |
| 6 | 10/13/94 | 3:50 PM | Court: Error in verdict form. |
| 7 | 10/13/94 | 4:00 PM | Jury: Is there any testimony from Nurse Coloni regarding C. Hynes eye from Southport. |
| 8 | 10/13/94 | 4:05 PM | Court: Corrected verdict form. |
| 9 | 10/13/94 | 4:55 PM | Jury: Decided to go home. |
| 10 | 10/14/94 | 10:40 AM | Jury: Testimony of Cobb & Shope when they stated they first physically touched Hynes. (Plaintiff's and Defendant's). |
| 11 | 10/14/94 | 11:55 AM | Jury: Did Shope/Cobb complete a "use of force" form or other paperwork on the Southport incident? If there is an exhibit, we would like to review it. (We don't need to listen to testimony). |
| 12 | 10/14/94 | 11:30 AM | Court: Answer to 11. |
| 13 | 10/14/94 | 11:50 AM | Jury: We would like to review the photographs of Hynes showing Southport injuries (or showing his appearance after the Southport incident). |
| 14 | 10/14/94 | 12:30 PM | Jury: Is there any exhibit that states whether or not Hynes was in leg restraints during the Southport incident? If so, we would like to review that exhibit. |
| 15 | 10/14/94 | 12:40 PM | Court: Answer to 14. |
| 16 | 10/14/94 | 12:42 PM | Jury: We'd like to listen to Hynes' testimony regarding the eye injury at Southport (*after* head injury happened) |
| 17 | 10/14/94 | 12:50 PM | Jury: We'd like to listen to any testimony regarding whether Hynes was in leg restraints during Southport incident. |
| 18 | 10/14/94 | 2:05 PM | Jury: We'd like to review the Inspector General's report on the Green Haven incident. |
| 19 | 10/14/94 | 3:00 PM | Jury: We'd like to review the photographs of the shower in Green Haven. |
| 20 | 10/14/94 | 3:35 PM | Jury: We'd like the photograph of Hynes after Green Haven incident. |
| 21 | 10/14/94 | 3:45 PM | Jury: We'd like any of these documents that are in evidence (relating to Green Haven): 1. unusual incident report; 2. use of force report, 3. ambulatory health record, 4. Employee injury report, 5. Misbehavior report. |

| Court Exhibit Number | Date | Time | Comment |
|---|---|---|---|
| 22 | 10/14/94 | 4:30 PM | Court: Recess until Monday. |
| 23 | 10/17/94 | 10:50 AM | Jury: If we answer "no" on questions 12, 17, and 19, do we still answer question 21? |
| 24 | 10/17/94 | 11:05 AM | Court: Answer to 23; proceed to question 23. |
| 25 | 10/17/94 | 11:20 AM | Jury: We need <u>Punitive damage</u> defined as it relates to this case. |

■ The Court's instruction to proceed to question 23 on the special verdict form prevented the jury from considering damages for the Green Haven incident, question 21, and punitive damages, question 22. Court Exhibit 25 requested an instruction on punitive damages. According to Hynes, since this question could not have been in regard to the Green Haven incident, it might be assumed that the jury requested the punitive damage instruction with regard to Southport and thus waited until it determined liability for the Green Haven incident to determine the damages for the Southport incident. Such an ordering, even if assumed, does not establish compromise.

An equally valid inference could be that pursuant to the instructions given they determined whether or not any damages were to be imposed and deferred the issue of punitive damages.

Here when "special interrogatories (were) submitted to a jury ..., the jury's answer thereto 'must be consistent with each other,' since they form the basis for resolving the case." *Brooks v. Brattleboro Memorial Hosp.*, 958 F.2d 525, 529 (2d Cir.1992). The "reviewing court must adopt a view of the case, if there is one, that resolves any seeming inconsistency." *Brooks*, 958 F.2d at 529.

There is no inconsistency in the answers to the questions posed in the Special Verdict Sheet. To base a conclusion of compromise based upon the inquiries posed by the jury is unwarranted and would be purely speculative. In reviewing these answers, one or more of the jurors may have had a second thought about punitive damages or may have wondered why there was no question concerning a possible punitive damages award to Officer Zemken for the intentional attack on him. To the lay-persons on the jury, it would not have been apparent that punitive damages are available in § 1983 claims, but not with respect to a state law claim for battery, an intentional tort. Once the instruction on punitive damages was given, and the jury was instructed that punitive damages could only be awarded against defendants, the jury promptly returned a verdict as to all claims.

■ Hynes also claims that the damages award is inadequate in light of the jury's determination not to award punitive damages to him. It is well-settled, and the Court instructed the jury, that an award of punitive damages is left to the sound discretion of the jury. *Smith v. Wade*, 461 U.S. 30, 52, 103 S.Ct. 1625, 1638, 75 L.Ed.2d 632 (1983). This is "a key feature of punitive damages ... they are never awarded as of right, no matter how egregious the defendant's conduct." *Id.* In this case, there is no inconsistency in recognizing that the members of the jury refused to exercise their discretion to award Hynes punitive damages in view of his actions which initiated the Southport incident.

### The Evidentiary Rulings Do Not Require a New Trial

■ Defendants Cobb and Shope seek a new trial because the underlying facts concerning Hynes' conviction and certain portions of his prison record were excluded in the Rule 404(b), Fed.R.Evid., determination. The balance struck between prejudice and relevance was appropriate.

The details of Hynes' conviction for murder would have been highly prejudicial to Hynes. His violent conduct in the past under totally different circumstances was only marginally relevant, if at all, to the incidents at Southport and Green Haven, either chronologically or circumstantially. The balance in favor of exclusion on the grounds of prejudice was appropriate.

■ As to Hynes' disciplinary record, the Second Circuit employs an "inclusionary" approach to the admissibility of evidence under Fed.R.Evid. 404(b) of similar acts evidence. *Ismail v. Cohen,* 899 F.2d 183, 188 (2d Cir. 1990); *United States v. Brennan,* 798 F.2d 581, 589 (2d Cir.1986). This "inclusionary" approach allows for the admission of prior acts under any relevant purpose other than to show the defendant had the propensity to commit the act in question, and satisfies the probative-prejudice balancing test of Fed. R.Evid. 403. *United States v. Brennan,* 798 F.2d 581, 589 (2d Cir.1986). Defendants Shope and Cobb contend that Hynes' entire disciplinary history should have been admitted to demonstrate his belligerent and hostile personality.

■ Under Fed.R.Evid. 404(b), prior disciplinary offenses are inadmissible for the purposes of showing that the plaintiff was a violent person and, therefore, must have been the aggressor who precipitated the assault. *See Lewis v. Velez,* 149 F.R.D. 474, 483 (S.D.N.Y.1983); *Lataille v. Ponte,* 754 F.2d 33, 37 (1st Cir.1985); *Davis v. Mason County,* 927 F.2d 1473, 1484 (9th Cir.), *cert.*

*denied,* 502 U.S. 899, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991). *See also, Ismail v. Cohen,* 899 F.2d 183, 188 (2d Cir.1990) (other wrongful acts inadmissible to show propensity, though admissible for any other relevant purpose under "inclusionary" approach); *U.S. v. O'Connor,* 580 F.2d 38, 40 (2d Cir. 1978) (under the "inclusionary" approach, evidence of other crimes is not automatically admissible and the government must do more than "disclaim an intention of proving that the defendant is a bad man"); *U.S. v. Whalen,* 940 F.2d 1027, 1034 (7th Cir.), *cert. denied,* 502 U.S. 951, 112 S.Ct. 403, 116 L.Ed.2d 352 (1991) (in criminal case where inmate defendant accused of stabbing another inmate, the victim's disciplinary record that involved fighting was found inadmissible because it is a "classic example" of prior act evidence to show a propensity for violence).

■ The disciplinary records relating to assaultive conduct were admitted but the disciplinary records that were excluded were deemed not sufficiently relevant on the issue of initiation of the Southport or Green Haven incidents. Ten disciplinary records that were not admitted:

| | |
|---|---|
| Exhibit "EEE" | November 28, 1990 charge of Verbal Harassment of Officer |
| Exhibit "FFF" | August 5, 1989 charge of Threatening Officers |
| Exhibit "GGG" | March 6, 1989 charge of Threatening Officers |
| Exhibit "HHH" | February 4, 1989 charge of Threatening Officers |
| Exhibit "III" | December 22, 1988 charge of Threatening Officers |
| Exhibit "JJJ" | February 20, 1988 charge of Threatening Officers |
| Exhibit "NNN" | November 13, 1991 charge of Refusing Direct Order |
| Exhibit "OOO" | October 26, 1991 charge of Interference with Employee |
| Exhibit "PPP" | October 11, 1989 charge of Shank Possession |
| Exhibit "QQQ" | April 1, 1990 charge of Weapon Possession |

None of the above incidents involves Hynes physically assaulting anyone. With the exception of the two weapon possession incidents, they all involved Hynes being verbally abusive. Hynes' repeated threats to corrections officers do not establish intent, but propensity to commit the act alleged, which is not allowed under the Second Circuit's "inclusionary" approach. *See United States v. Brennan,* 798 F.2d 581, 589 (2d Cir.1986).

Hynes did not deny using obscene language with Cobb and Shope, nor does he deny refusing to be quiet when ordered by

them. Therefore, these incidents of threats and disobeying orders could not have been used to impeach his testimony either.

■ Two of the excluded disciplinary records, Exhibits "PPP" and "QQQ" dealt with weapons possessions. Neither of the incidents involved the use of any weapons on the part of Hynes and thus they would be highly prejudicial if admitted. *See e.g., United States v. Warledo,* 557 F.2d 721, 725 (10th Cir.1977) ("The courts have quite uniformly condemned the introduction in evidence of testimony concerning dangerous weapons, even though found in the possession of a

defendant, which have nothing to do with the crime charged.").

■ The defendants cited *Young v. Rabideau*, 821 F.2d 373 (7th Cir.1987), *cert. denied*, 484 U.S. 915, 108 S.Ct. 263, 98 L.Ed.2d 221 (1987) for the proposition that a plaintiff's prison disciplinary records may properly be introduced by defendants in excessive force cases to show, *inter alia*, intent and absence of mistake. However, in *Young*, the inmate plaintiff claimed he did not intend to poke the guard in the face or snatch the chain out of his hand, which precipitated the assault that occurred thereafter. *Id.* at 379. Hynes did not claim to have had any "accidental" contact with the defendants from either the Southport or Green Haven incident.

■ Defendants also cited *West v. Love*, 776 F.2d 170 (7th Cir.1985) in which the prison disciplinary records were admissible to show that the defendant officers' actions were reasonable, in light of their knowledge of the plaintiff's dangerous propensities. *Id.* at 175. In the case at hand, both Cobb and Shope testified that they had never met Hynes before the incident and had no knowledge of his record.

■ Finally, Rule 103(a), Fed.R.Evid., provides that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." Hynes' convictions and several disciplinary reports were admitted as evidence. The Green Haven defendants detailed testimony about Hynes' allegedly "belligerent and assaultive personality," as well as the violent acts he was alleged to have committed in that incident. Defendants have failed to establish any substantial prejudice from the inadmissibility of Hynes' disciplinary record.

■ When Hynes' counsel inquired of Shope whether it would have been a deterrent to have written an inmate misbehavior report for Hynes' behavior on May 30, 1991, it did not open the door for Hynes' entire disciplinary record. Officer Shope testified that before May 30, 1991 he did not know Hynes. Therefore, Shope was not answering this question subjectively about Hynes, but objectively about inmates in general. Since Shope did not know Hynes, his disciplinary record was not relevant to the answer.

According to the defendants, a new trial is required because of the failure to admit additional evidence on Hynes' size, and the admission of evidence of prior workmen's compensation records of Shope and his prior use of force.

■ The relative size of Hynes and the defendants was determined to be relevant to the Southport incident and was fully addressed as the relative height and weight. There was one instance, however, where defense counsel was not permitted to elicit testimony regarding this issue, and this was because defense counsel's line of questioning concerning Dave Meggett was too wide of the mark. Because defense counsel belabored the issue the following exchange occurred:

Mr. Latimer: Objection, your honor.

The Court: Sustained.

Mr. Lieberman: We'll get to it, your Honor.

The Court: No, you won't. Next question. This is the Charles Atlas 97 pound weakling argument, okay? These people are not dumb. They get the picture.

Out of the jury's presence, the Court later clarified its opinion:

Mr. Latimer: The purpose of that testimony, Judge, is—

The Court: Well, it is what I, perhaps, rather flippantly referred to as the "97 pound weakling" argument, which really, I must say I shouldn't have done. I mean I shouldn't have done it, and I did it, and there it is. But it was a hard day, and *it was going on forever.* And when we got to the Buffalo Bills. (emphasis added).

Mr. Lieberman: Giants.

The Court: Okay, all right, the Giants, it did seem we were straying a little far afield. That didn't mean necessarily that the issue was irrelevant, because I think the issue was there.

(Tr. 490).

Thus, the Court made it clear to the defense counsel that they were permitted to

address the issue of size; they just could not make analogies to the Giants.

In their closing, defense counsel directly addressed the issue of Hynes' size without objection or correction:

> Yes, I submit to you that looks are deceiving. You look at Mr. Hynes, a man who's five foot five, weighs approximately 145 pounds. But, I ask you, that man doesn't matter, his stature. He could still hurt someone who's almost a head taller or a foot taller than he is.

> Mr. Hynes is a convicted killer and a robber. I'm certain that his victims did not find solace in his small stature.

(Tr. 1044–5).

Evidence concerning workers' compensation claims and prior use of force forms by defendants were bad acts admissible under "inclusionary" approach, as was similar evidence as to Hynes. The vast majority of these instances pertained to the Green Haven incident where the Green Haven defendants were exonerated.

■ Shope, however, was asked by Hynes' counsel how many times he was involved in the use of force over the course of his career. This question was proper under the Second Circuit's "inclusionary" approach to prior bad acts. *Ismail v. Cohen*, 899 F.2d 183 (2d Cir.1990); *United States v. Brennan*, 798 F.2d 581, 589 (2d Cir.1986). On direct examination by defense counsel, Shope testified that he does not always file an inmate misbehavior report when an inmate violates prison rules. The question by Hynes' counsel to Shope about the amount of use of force over the course of his career was followed up with questions regarding how many times a misbehavior report was written by him after being involved in a use of force incident. He testified that he had written misbehavior reports in all the use of force incidents that he was involved. However, in the case at hand there was a use of force, but no misbehavior report written.

Shope was also questioned about a workmen's compensation incident for a hand injury sustained while restraining an inmate.

■ On direct testimony Shope testified that he did not have any anger at Hynes because of the riot, because he disobeyed an order, nor for cursing, nor for resisting his attempts to move him to the next room. On cross-examination, Shope testified that during the course of his career with DOCs he had never used excessive force. He testified that he had never hit an inmate with his fists, kicked or slapped an inmate. The workmen's compensation hand injury evidence was appropriate cross-examination.

The admission of certain evidence concerning the use of force by Sergeant Gladding has been mooted by the jury verdict in her favor.

■ Hynes has also sought a new trial arising out of the refusal to admit bad act evidence relating to Doyle. The first involved an injury that Doyle claimed he received on the job, which workmen's compensation board found to be not job related and the second involved Doyle being suspended for three months for giving false information to a lieutenant. Neither was relevant to the issues presented.

■ During cross-examination of physician assistant McCue, Hynes' counsel attempted unsuccessfully to elicit testimony from him regarding incidents where he was written up for not performing his duties. The incidents, even if subject to an inference of bias against prison inmates, failed to be relevant on the issue of his medical testimony.

### The Summations Do Not Warrant a New Trial

■ Trial courts have discretion to determine when the conduct of counsel is so improper as to warrant a new trial. *Matthews v. CTI Container Transport Intern., Inc.*, 871 F.2d 270, 278 (2d Cir.1989). Not every improper or poorly supported remark made in summation irreparably taints the proceedings; only if counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury should a new trial be granted. *Matthews*, 871 F.2d at 278, *citing, Smith v. National R.R. Passenger Corp.*, 856 F.2d 467, 470 (2d Cir.1988). The jury exon-

erated the Green Haven defendants and the damage award to plaintiff in the Southport incident was $1,250 in compensatory damages with no punitive damages. *See Kehr v. Smith Barney, Harris Upham & Co., Inc.,* 736 F.2d 1283, 1286 (9th Cir.1984) (attorney misconduct does not warrant new trial when award of damages not excessive); *City of Cleveland v. Peter Kiewit Sons Co.,* 624 F.2d 749, 759 (6th Cir.1980) ("the excessive size of the verdict demonstrates the prejudicial effect of counsel's comments").

■ "In arguing to a jury, counsel must properly have some latitude so long as prejudice does not appear." *Schwartz v. Northwest Airlines, Inc.,* 275 F.2d 846, 846 (2d Cir.1960). Claims of attorney misconduct must be viewed in the context of the trial as a whole. *Datskow v. Teledyne Continental Motors,* 826 F.Supp. 677, 687 (W.D.N.Y. 1993). In *Datskow,* the jury was instructed to disregard some of counsels conduct. Similarly, corrective instructions were issued following the summation on behalf of the defendants in this case.

The Second Circuit has stated that "not all misconduct of counsel taints a verdict to such a degree as to warrant a new trial." *Pappas v. Middle Earth Condominium Ass'n,* 963 F.2d 534, 540 (2d Cir.1992). In reviewing counsel's misconduct, the Court must consider the:

> [t]otality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (*e.g.,* whether it is a close case), and the verdict itself.

*City of Cleveland v. Peter Kiewit Sons' Co.,* 624 F.2d 749, 756 (6th Cir.1980); *see also Fineman v. Armstrong World Industries, Inc.,* 980 F.2d 171, 207 (3rd Cir.1992) ("a combination of improper remarks are required to persuade us of prejudicial impact [on a jury]"); *Strobl v. New York Mercantile Exchange,* 582 F.Supp. 770, 780 (S.D.N.Y. 1984), *aff'd,* 768 F.2d 22 (2d Cir.), *cert. denied,* 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985). The remarks of neither counsel for plaintiff or the defendants, when viewed from a cumulative perspective, failed to reach such prejudicial heights as to require a new trial.

### The Determination of the Qualified Immunity Defense Does Not Require a New Trial

Shope and Cobb seek a new trial to require the Court to determine their qualified immunity defense. The authority cited for the requirement, *Finnegan v. Fountain,* 915 F.2d 817 (2d Cir.1990), does not require such a holding.

Question 5 of the jury's special verdict form states:

> Was the force that each officer applied that which a reasonable corrections officer on the scene would have applied under the circumstances?

■ The standard governing a defense of qualified immunity to an excessive force is whether it was "objectively reasonable" for the officer to believe that he/she did not violate the plaintiff's rights. *Calamia v. City of New York,* 879 F.2d 1025, 1036 (2d Cir.1989). Since the facts to the case at hand were in dispute, it was a proper question for the jury to answer.

Defense counsel propounded the wording of special verdict question 5 and did not object to this question when it was finalized.

■ Further, of course a ruling of qualified immunity in favor of Cobb and Shope would be inconsistent with the jury verdict, the very vice requiring reversal in *Finnegan, supra.* Prison officials are entitled to qualified immunity unless: (1) their conduct violates a clearly established statutory or constitutional right; (2) they knew or should have known the right was clearly established; and (3) they knew or should have known their conduct violated the right. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982). The law regarding the use of force by prison guards was clearly established prior to the Southport incident. *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251, 265 (1986).

The standard the jury used to reach their verdict on the issue of excessive force was whether malicious and sadistic force was used, which is the standard the Supreme Court established in determining whether the use of force by law enforcement officials is excessive. *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251, 265 (1986); *Hudson v. McMillian,* 503 U.S. 1, 6, 112 S.Ct. 995, 999, 117 L.Ed.2d 156, 166 (1992). The jury's finding was specific in its answers to Question 4.

The "malicious and sadistic" standard was adopted by the Court because, "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000, 117 L.Ed.2d at 167. Since the jury found the defendants liable under the standard of "malicious and sadistic" force, it would be inconsistent to characterize their actions as reasonable. *See King v. Macri,* 993 F.2d 294, 299 (2d Cir. 1993) ("Since a reasonable jury could find that reasonable officers in defendant's position would not have believed they were acting lawfully, the District Court properly found the defense of qualified immunity unavailable."). By denying the defendants' motion for a new trial in this regard, the Court has determined that they are not entitled to qualified immunity.

### Conclusion

For all of the foregoing reasons, all motions for judgment as a matter of law and for a new trial are denied.

It is so ordered.

### APPENDIX A

### SPECIAL VERDICT FORM

Answer each of these questions in the order given. Do *not* write anything on this form except to check "YES" or "NO" or to strike out a name in accordance with the instructions below. Do not answer any question as to a defendant whose name has been stricken.

### SOUTHPORT

### Section 1983

### Eighth Amendment

1. Did either of the following defendants apply force to Hynes at Southport?

COBB  YES _____  NO _____

SHOPE  YES _____  NO _____

If you have answered NO with regard to both defendants, proceed to the GREEN HAVEN section and Question 9. If you have answered NO with regard to either defendant, proceed to Questions 2, 3, 4, 5 and strike the name of that defendant. If you have answered YES with regard to either defendant, proceed to Question 2.

2. Did either of the following defendants injure Hynes at Southport?

COBB  YES _____  NO _____

SHOPE  YES _____  NO _____

If you have answered NO with regard to both defendants, proceed to the GREEN HAVEN section and Question 9. If you have answered NO with regard to either defendant, proceed to Questions 3, 4, 5 and strike the name of that defendant. If you have answered YES with regard to either defendant, proceed to Question 3.

3. Were the defendants' acts and conduct the proximate cause of any injuries to Hynes?

COBB  YES _____  NO _____

SHOPE  YES _____  NO _____

If you have answered NO with regard to both defendants, proceed to the GREEN HAVEN section and Question 9. If you have answered NO with regard to any defendant, proceed to Questions 4, 5 and strike the name of that defendant. If you have answered YES with regard to either defendant, proceed to Question 4.

4. Did either of the following defendants apply force to Hynes maliciously and sadistically to cause harm rather than in a good faith effort to maintain and restore discipline.

COBB  YES _____  NO _____

SHOPE  YES _____  NO _____

If you have answered NO with regard to both defendants, proceed to the GREEN

HAVEN and Question 9. If you have answered NO with regard to any defendant, proceed to Question 5 and strike the name of that defendant. If you have answered YES with regard to either defendant, proceed to Question 5.

5. Was the force that each officer applied that which a reasonable corrections officer on the scene would have applied under the circumstances?

| | | |
|---|---|---|
| COBB | YES _____ | NO _____ |
| SHOPE | YES _____ | NO _____ |

If you have answered YES with regard to both defendants, proceed to the GREEN HAVEN section and Question 9. If you have answered NO with regard to either defendant, proceed to Question 6.

6. Was the force applied to any of the following portions of Hynes' body?

| | | |
|---|---|---|
| EYE | YES _____ | NO _____ |
| HEAD | YES _____ | NO _____ |
| BODY | YES _____ | NO _____ |

Proceed to Question 7.

### Damages—Southport

7. What damages, if any, did Hynes suffer?

| | |
|---|---|
| Nominal | $ _____ |
| Pain and Suffering | $ _____ |

If your answer is $0, proceed to Question 9. If you award any damages, proceed to Question 8.

8. Is Hynes entitled to punitive damages?

YES _____ NO _____

Proceed to Question 9.

### GREEN HAVEN

### Section 1983

### Eighth Amendment

9. Did any of the following defendants apply force to Hynes at Green Haven?

| | | |
|---|---|---|
| GLADDING | YES _____ | NO _____ |
| RHYNDERS | YES _____ | NO _____ |
| ZEMKEN | YES _____ | NO _____ |
| DOYLE | YES _____ | NO _____ |

If you have answered NO with regard to all defendants, proceed to the FIRST AMENDMENT section and Question 17. If you have answered NO with regard to any defendant, proceed to Questions 10, 11, 12, 13 and strike the name of that/those defendant(s). If you have answered YES with regard to any defendant, proceed to Question 10.

10. Did any of the following defendants injure Hynes at Green Haven?

| | | |
|---|---|---|
| GLADDING | YES _____ | NO _____ |
| RHYNDERS | YES _____ | NO _____ |
| ZEMKEN | YES _____ | NO _____ |
| DOYLE | YES _____ | NO _____ |

If you have answered NO with regard to all defendants, proceed to the FIRST AMENDMENT section and Question 17. If you have answered NO with regard to any defendant, proceed to Questions 11, 12, 13 and strike the name of that/those defendant(s). If you have answered YES with regard to any defendant, proceed to Question 11.

11. Were the defendants' acts and conduct the proximate cause of any injuries to Hynes?

| | | |
|---|---|---|
| GLADDING | YES _____ | NO _____ |
| RHYNDERS | YES _____ | NO _____ |
| ZEMKEN | YES _____ | NO _____ |
| DOYLE | YES _____ | NO _____ |

If you have answered NO with regard to all defendants, proceed to the FIRST AMENDMENT section and Question 17. If you have answered NO with regard to any particular defendant, proceed to Questions 12 and 13 and strike the name of that/those defendant(s). If you have answered YES with regard to any defendant, proceed to Question 12.

12. Did any of the following defendants apply force to Hynes maliciously and sadistically to cause harm rather than in a good faith effort to maintain and restore discipline?

GLADDING   YES _____   NO _____

RHYNDERS   YES _____   NO _____

ZEMKEN   YES _____   NO _____

DOYLE   YES _____   NO _____

If you have answered NO with regard to all defendants, proceed to the First Amendment section and Question 17. If you have answered NO with regard to any particular defendant, proceed to Question 13 and strike the name of that/those defendant(s). If you have answered YES with regard to any defendant, proceed to Question 13.

13.   Was the force that each officer applied that which a reasonable corrections officer on the scene would have applied under the circumstances?

GLADDING   YES _____   NO _____

RHYNDERS   YES _____   NO _____

ZEMKEN   YES _____   NO _____

DOYLE   YES _____   NO _____

If you have answered YES with regard to all defendants, proceed to the First Amendment section and Question 17. If you have answered NO with regard to any defendant, proceed to Question 14.

14.   Was the force applied to any of the following portions of Hynes' body?

EYE   YES _____   NO _____

HEAD   YES _____   NO _____

ARMS   YES _____   NO _____

LEG   YES _____   NO _____

FOOT   YES _____   NO _____

BACK   YES _____   NO _____

BODY   YES _____   NO _____

Proceed to Question 15.

### Bystander Liability

15.   Did Capra have a reasonable opportunity to intercede and fail to intercede in order to prevent an unconstitutional act by other defendants?

YES _____   NO _____

If you have answered NO to this question, proceed to Question 17. If you have answered YES to this question, proceed to question 16 below.

16.   Was his failure to intercede the proximate cause of the injuries Hynes suffered because of the deprivation of Hynes' constitutional rights.

YES _____   NO _____

Proceed to Question 17.

### First Amendment

17.   Did any of the following defendants assault Hynes in retaliation for Hynes' complaining about prison conditions?

GLADDING   YES _____   NO _____

RHYNDERS   YES _____   NO _____

ZEMKEN   YES _____   NO _____

DOYLE   YES _____   NO _____

If you have answered NO with regard to all defendants, proceed to Question 19. If you have answered NO with regard to any defendant, proceed to Question 18, 18a and strike the name of that/those particular defendant(s). If you have answered YES with regard to any defendant, proceed to Question 18 below.

18.   Were defendants' acts and conduct the proximate cause of any physical injuries to Hynes?

GLADDING   YES _____   NO _____

RHYNDERS   YES _____   NO _____

ZEMKEN   YES _____   NO _____

DOYLE   YES _____   NO _____

If you have answered NO with regard to all defendants, proceed to Question 19. If you have answered NO with regard to any defendant, proceed to Question 18a and strike the name of that/those particular defendant(s). If you have answered YES with regard to any defendant, proceed to Question 18a.

18a.   Was the force that each officer applied that which a reasonable corrections officer on the scene would have applied under the circumstances?

GLADDING   YES _____   NO _____

RHYNDERS   YES _____   NO _____

ZEMKEN   YES _____   NO _____

DOYLE   YES _____   NO _____

Proceed to Question 19.

**Supervisory Liability:**

19. Did Gladding fail to supervise the defendant officers at Green Haven properly in order to prevent an unconstitutional act?

YES _____   NO _____

If you have answered NO to this question, proceed to Question 21. If you have answered YES to this question, proceed to question 20 below.

20. Was her failure of supervision the proximate cause of the deprivation of Hynes' constitutional rights.

YES _____   NO _____

Proceed to Question 21.

*Damages—Green Haven*

21. What damages, if any, did Hynes suffer in the Green Haven incident?

Nominal Damages     $ _____

Pain and Suffering:

July 3, 1991 to present   $ _____

Future Pain and Suffering  $ _____

If your answer is $0, proceed to Question 23. If you award any damages, proceed to Question 22.

22. Is Hynes entitled to punitive damages?

YES _____   NO _____

Proceed to Question 23

### *ZEMKEN'S COUNTER CLAIM*

**Battery**

23. Did Hynes commit a battery on Zemken?

YES _____   NO _____

If your answer to Question 23 is "YES," proceed to Question 24. If your answer to Question 23 is "NO" proceed to the STOP instruction.

24. Were Hynes' acts and conduct the proximate cause of any injuries to Zemken?

YES _____   NO _____

If your answer to Question 24 is "NO," proceed to the STOP instruction. If your answer to Question 24 is "YES," proceed to Question 25.

*Damages*

25. What damages, if any, did Zemken suffer from the battery by Hynes?

Pain and Suffering     $ _____

**STOP:** Sign the form and advise the Marshal that you have reached a verdict.

_____

Foreperson